2013-1077, Mr. Pacino. Yes, Judge. May it please the Court, Alzheimer's is a disease for which there is no cure. Dr. Frank Toppo, former medical director of the Nathan Alderson Hospital in Nevada, had discovered that the administration of trans-resveratrol increased the levels of good cholesterol and at the same time decreased the levels of bad cholesterol. Dr. Toppo further realized that the administration of trans-resveratrol could affect the brain chemistry in such a complicated mechanism, a lot of reduction in the plaques that are the tail marks of Alzheimer's disease. What are you claiming that isn't found in Kavaza and Lee? Can you repeat your question, Your Honor? What do you claim, what's in your claim that isn't already found in some combination of Lee and Kavaza? I would say that in Kavaza itself does state the trans-resveratrol. However, Kavaza has multiple indications and hence multiple patients and also a very broad genus and there's no credible basis to choose trans-resveratrol based on Kavaza itself. In terms of Lee, our position is that Lee does not disclose trans-resveratrol because Lee's functional definition of resveratrol excludes the trans-resveratrol based on its tox-2 inhibition specific inhibitor property. I'm not sure what role, at least in anything less than the really extreme cases, the large number of drugs, let's say, and the large number of conditions that those drugs may treat, what role that may play in rendering a reference less compelling as prior art. For example, if you have a prior art, let's say the physician's desk reference that says the following painkillers can be used with respect to the following forms of pain that can be safely used and you have eight painkillers and you have eleven different areas of body pain and types of pain, somebody can't come along later and say, well, I'm going to pick number three, ibuprofen, and I'm going to pick number nine, pain in the hip, and I get a patent. Why isn't that Kavaza? I think the large number of indications and the large number of compounds also lend to our credibility and the motivation of whether one of ordinary skill in the art would start with a particular indication, unlike the physician's desk reference that you just described, Your Honor, where the treatment and the indication is much more predictable, say the ability to cure pain. Here we're working in a field where there is no known cure and now we're asked to choose not only from Alzheimer's disease, but pre-senile dementia and neurotoxic. Right, but what I'm struggling with is why, is it a question of the degree of certainty? I mean, suppose it weren't the physician's desk reference, but it were a paper that somebody had written and said, you know, these painkillers would seem in all likelihood to have some utility with respect to this list of conditions. Wouldn't that be, if not anticipating, wouldn't it be a very strong prior art reference? I think it would anticipate the actual claim without any other structure and, for example, without further amounts, which are a claim. Like dosage issues? So it could be a dosage, but I think the question is whether one would start with the actual compound that you've chosen from the list and then use that in the hopes of a treatment for the particular indication in question. So in my case, you would say it would be possible for somebody to say, I get a patent on ibuprofen used for hip pain, because no one had a list that was limited just to one or two of each. Your Honor, I think I've seen several of those patents and in this case, Kvaza, again, isn't necessarily limited just to the one compound and the one indication I understand are claims are broad enough to list a claim on appeal. Okay. And based on the record, the Board affirmed the examiner's rejection with regard to anticipation as we're talking about, with regards to Lee, said that Lee also provided the motivation to choose the transverse veritrol based on Lee's statement of reverse veritrol per se without any indication. However, a more closer reading of Lee indicates that Lee's veritrol has a COX-2 specific inhibitor properties, which expert Harry Ensley, former professor at Tulane University, declares that he saw evidence to the contrary, that the transverse veritrol was not a specific inhibitor of COX-2 function. So, based on that, he also cited a reference, I think pronounced Sawcheck's, S-Z-E-W-C-Z-U-K, reference to support his findings. And so, it's not necessarily a conclusory statement, but actually a statement that's corroborated by independent publication, peer-reviewed publication. The Board dismissed the declaration of Dr. Ensley and others based upon that the, that we have not, ACAPO has not shown that Lee's reverse veritrol falls outside the scope of Cavazza's reverse veritrol. Now, Cavazza defined reverse veritrol much more broadly, cited in the briefs, but Cavazza defined reverse veritrol as a cyst, a trans, and as well as these glycosides and esters thereof, and according to Dr. Ensley, it's a potentially infinite number of compounds. And you agree that all of those findings are reviewed for substantial evidence, reviewed by us? Right, I think our position is that had the Board considered the evidence, they would not have come to this conclusion. The examiner did not consider this evidence. If you go to A840, the examiner did not consider the evidence. Well, the Board considered the evidence, right? I don't believe the Board gave consideration to this evidence. My understanding is the Board said that we have not shown, TAPO has not shown, what Lee's reverse veritrol is, and in our situation, we have taken a step to show what Lee's reverse veritrol is not, based on the functional definition provided by Lee. Dr. Ensley declared that he saw that transverse veritrol is not a specific inhibitor of COX-2 activity. So by showing what Lee's reverse veritrol is not, we hope to remove Lee from the equation regarding whether or not to choose transverse veritrol. And here, because the transverse veritrol doesn't have the properties of Lee, we further add that that's a reason not to select transverse veritrol as a promising treatment for treating Alzheimer's disease. The Board also cited Kvaza, and as we talked earlier with Judge Bryson, Kvaza has multiple indications, and we cited that for the credibility aspect. But also, we note that the, and I don't think this is disputed in the record, that these experimental tests in Kvaza are not prohibitive of treatments of Alzheimer's disease. For example, having an endothelium-1 type ischemic event in a lab rat or a model that can be used is declared by not only Dr. Ensley, inventor Dr. Toppo, and also a third expert from the Cleveland Clinic in Nevada, Dr. Bernick, that these are not prohibitive or predictive of Alzheimer's disease. So at this point, what we're left with is a statement in Kvaza that the, one of many drugs can be used for multiple indications, in addition to the fact that those are in claim. But also we have the second prong, which is that Lee says not to use the transverse veritrol because it doesn't have the functional attributes of the malaises that are predicted to have the functions for treating Alzheimer's disease. Why don't we turn to the government. The board here quite properly affirmed the examiner's findings that the claimed invention is obvious in view of the prior art. Here Toppo's claimed invention has essentially three elements. Administering transverse veritrol at particular dosages between 200 and 1,000 milligrams to treat Alzheimer's disease. Both of the prior art references, Kvaza and Lee, teach administering transverse veritrol and actually teach, disclose and claim administering transverse veritrol to treat Alzheimer's disease. And as the board found, Kvaza expressly discloses transverse veritrol and Kvaza provides very strong suggestion to use dosages around 500 milligrams. So why do we need Lee? I mean, the board rejected the notion of the examiner's finding of anticipation. What the board said, I think, at A4 in its opinion is that it acknowledges what the examiner had said, which is that Lee didn't expressly state 500 mg transverse veritrol, but still the board said Kvaza gives a very strong suggestion that that would be appropriate because it teaches administering a one-to-one ratio of L-carnitine and resveratrol and then further provides specific example formulations that consist of 500 mg of L-carnitine, thereby strongly suggesting that 500 mg of resveratrol would be an appropriate dosage. And then the board went on to say, well, Lee essentially confirms that 500 mg dosages or 500 or 1,000 would be appropriate dosages for administering resveratrol and that is expressly disclosed in Lee. What do you do about the indication, without giving it a stronger word, that in Lee, although he has said it a couple of times without specifically calling it a specific COX-2 inhibitor, the last mention, I think it's column 21, says a preferred embodiment involves specific COX-2 inhibitors, including a few things, the last of which is resveratrol. Why wouldn't a skilled artisan take away from that that it's the form of resveratrol that actually is a specific COX-2 inhibitor, namely one that inhibits the COX-2 without simultaneously seriously inhibiting COX-1? I have a couple of responses to that. The first is that the claimed invention says nothing at all about COX inhibition and Lee directly teaches that resveratrol is effective at treating Alzheimer's disease. This is shown in Figure 13, where they do studies on astrocytes and show effectiveness of resveratrol in affecting APP, amyloid precursor protein, and as you may know, amyloid plaques are the hallmark of Alzheimer's disease. So, you know, regardless of its mechanism of action, there's conclusive evidence in that resveratrol is effective against Alzheimer's disease. Now with respect to the question of the specificity for COX-2, you know, specific is a, I guess, a term that depends in context, and I think if you look overall at the teachings of Lee and I would direct you to column 12, beginning at line 34, and also, I'm sorry, at column 4, beginning at line 35, and then also again at column 12, beginning at line 12. There's no doubt that Lee talks about a variety of compounds, including a broad class of non-steroidal NSAIDs, and then it also specifically says there's some NSAIDs that are also specific COX-2 inhibitors, because it's a good thing to leave the COX-1 alone while inhibiting the COX-2. Fewer side effects may not have any beneficial effect for the treatment you're trying to achieve, the Alzheimer's, but it does diminish side effects, and then, so it mentions resveratrol as part of a larger group, but the last time it mentions it, in column 21, it says resveratrol a COX, specific COX-2 inhibitor. Now why wouldn't a sealed artisan take from Lee that, oh, the resveratrol that has previously been talked about is the one that satisfies this last identified property, namely of being a specific COX-2 inhibitor, which I gather there's at least, anyway, that's one of the Alzheimer's, but not the other. Right. No, I understand your question, but I think if you look overall at Lee, I think what one has led to, and that, again, beginning at column four at line 35, it sort of, it talks about aspirin, like most NSAIDs, inhibits both COX-1 and COX-2, and then it specifically mentions resveratrol, and then goes on to say, you know, these traditional NSAIDs are more potent against COX-1 than COX-2, which is consistent with what Suchuk teaches, which is basically that resveratrol is more, has a stronger inhibitory efficacy against COX-1. Now with respect to sort of that extra little reference there, I think there is language with, you know, again, what Lee has said is that resveratrol is specific for COX, you know, overall for COX as compared to other enzymes, but I think, and it has inhibits specific for COX-1 and COX-2, but it seems to be more highly effective against COX-1. So I don't think it's just sort of saying that the specific inhibitor of COX-2 is wrong, because it does have some inhibitory activity against COX-2, but more generally in the reference, I think in a couple instances, it's very clear that what it considers to be the ones that are really highly selective against COX-2 are DFU and DFP, and you'll see that further on in, on column four, and also in column 12, line 34, it talks about NSAIDs, where it refers to figure 16, well figure 16 is the resveratrol study, and then it talks about NSAIDs that are selective COX-2 inhibitors, it then references figure 17, and that is the studies with DFU and DFP. So I think generally, Lee seems to be appreciating that resveratrol, like most traditional NSAIDs, is more effective against COX-1 than COX-2. But even if, I mean, I think, you know, I think the better, best explanation, rather than, as my opposing counsel is suggesting, that this would be some evidence that transresveratrol is not effective, is a specific inhibitor of COX-2, I think a better, I guess, explanation is perhaps that Lee may have some imprecise drafting, or maybe Lee was not fully appreciative of the mechanism of action of transresveratrol. After all, Lee was filed in 1999, Suchuk was not published until 2004, but regardless of the mechanism of action, what is very clear from Lee is that resveratrol is effective against Alzheimer's disease, and that is what the, you know, the claim convention is. Could you, on the same theme, could you comment on the Colossus, Colossus, yeah, Colossus Column 1, the statement that resveratrol comes in both the trans and the cis form, of course, and it says, i.e., in reference to transresveratrol, resveratrol proper. What was Cavassa saying in saying resveratrol proper? Do you understand from the context what that suggests? Does it suggest to a person of ordinary skill and the art that when you see the word resveratrol you are going to assume that transresveratrol is intended? I think that's right. I think that... Is there anything else besides that in the record? Unfortunately, there's nothing else in the record, well, other than the examiners, the examiners finding that the STN database, and, you know, STN are people of skill and the art, and they assign the registry number for transresveratrol to the Lee patent, and, you know, the board, you know, didn't adopt that finding, but I think there's certainly, to a person of skill and the art, transresveratrol was commonly referred to as resveratrol proper. It was the one that was commonly, it was also referred to as resveratrol. It was the one that everyone in the 1990s was using, and my understanding, I don't even think cisresveratrol was commercially available even, you know, in the 2000s. Do you have no further questions? I'll cede the remainder of my time. Thank you. Briefly, Your Honor, I'd like to take, I'd like to point out that I don't think there's any evidence in the record that the folks at Parity STN database are skilled in the art, or was that ever raised as a point to be challenged. I think the more precise way of determining the meaning of terms in a patent is from the patent itself, just like we do in claim construction with Philips. So if we look through the patent, as Judge Toronto pointed out, there is the statement that the COX, two specific inhibitors, includes resveratrol, and I'd like to direct the Court's attention to the passages at 1486, A1486, line 30, 29, 20, 27. That paragraph also states, not that it's COX too, but it's... 1486. My glasses stink. Seven. A1486, Your Honor. This is the Lee patent, right? This is the Lee patent, correct. You've been referring to the Lee patent. Right, and the fact that Lee also refers to the resveratrol in this paragraph as the NSAID, and the NSAID is the COX-2 inhibitor, and we cited those passages in the brief where this is laid out in the record, that COX-2 is for the NSAID and the COX-1 is for, say, cardiovascular-type functions. And if there's no more further questions, I'd just like to submit that I think it's an error not to consider the evidence, and I'd like the Court to consider the evidence that would not have made the findings it did. Thank you. We thank both counsel for the cases submitted, and that concludes the hearing today.